[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12130
_____

D.C. Docket No. 1:13-cr-00051-WLS-TQL-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEPHON WILLIAMS,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Georgia

_____

(September 4, 2018)

Before TJOFLAT and JORDAN, Circuit Judges, and HUCK,* District Judge.

JORDAN, Circuit Judge:

_____

* Honorable Paul C. Huck, United States District Judge for the Southern District of Florida,
sitting by designation.

Divided loyalties often prove to be a source of mischief in human relations. As this case illustrates, they can also cause serious trouble for an attorney and his client.

Following a seven-day trial, a jury convicted Stephon Williams of a federal narcotics conspiracy offense. *See* 21 U.S.C. § 846. Kim Minix represented Mr. Williams at trial. At the time of trial, Mr. Minix was also representing Tyree Bennett, a government witness who was then appealing his own sentence after pleading guilty to federal narcotics charges. Although Mr. Minix knew that Mr. Bennett had been found to have obstructed justice in his own criminal case, he did not ask him about the obstruction scheme at Mr. Williams' trial. In fact, Mr. Minix asked Mr. Bennett no questions whatsoever.

On appeal, Mr. Williams—represented by different counsel—contends that he is entitled to a new trial because Mr. Minix, due to his simultaneous representation, passed up a valuable opportunity to cross-examine and impeach Mr. Bennett. We conclude that Mr. Minix labored under a conflict, and that Mr. Williams is entitled to an evidentiary hearing to explore whether this conflict adversely affected Mr. Minix's performance. [1]

**I**

---

[1] Donterius Toombs was tried and convicted together with Mr. Williams. We consolidated the appeals of Mr. Toombs and Mr. Williams for briefing and oral argument, but now sever the appeals, and decide Mr. Toombs' appeal in a separate opinion.

2

We begin by summarizing the proceedings in the cases of Mr. Williams and Mr. Bennett.

## A

In September of 2013, Mr. Bennett, pursuant to charges filed in a superseding information, pled guilty to conspiring with others to possess cocaine and marijuana with the intent to distribute, in violation of 21 U.S.C. § 846. The information alleged that the conspiracy, which was based in southern Georgia, lasted from sometime in 2009 to December of 2011. After entry of the plea, the district court appointed Mr. Minix to represent Mr. Bennett at sentencing. [One month later, in November of 2013, a grand jury charged Mr. Williams with participating with others (including Mr. Toombs) in a conspiracy to possess cocaine and crack cocaine with the intent to distribute, in violation of 21 U.S.C. § 846. The conspiracy, according to the indictment, was based in Albany, Georgia, and spanned from January of 2010 to December of 2012. The district court appointed Mr. Minix to represent Mr. Williams. The sentencing hearing for Mr. Bennett took place in early 2014. At the hearing, the district court imposed an obstruction of justice enhancement on Mr. Bennett pursuant to U.S.S.G. § 3C1.1 and denied him an acceptance of responsibility adjustment pursuant to U.S.S.G. § 3E1.1. These two decisions were based on a letter that Mr. Bennett sent in July of 2013 to Mr. Toombs—Mr. Williams' alleged co-conspirator—asking him to

3

cooperate on Mr. Bennett's behalf as a third party in exchange for a substantial payment, and to market a cooperation-for-hire scheme to inmates seeking sentence reductions.    The district court sentenced Mr. Bennett to 156 months' imprisonment, and he appealed.  Mr. Bennett's appeal, which was handled by Mr. Minix, was pending in the Eleventh Circuit at the time of Mr. Williams' trial in October of 2014.

## B

The joint trial of Mr. Williams—still represented by Mr. Minix—and Mr. Toombs lasted seven days.  The jury heard testimony from more than a dozen witnesses, including a number of persons who had been charged with narcotics offenses and were cooperating with the government.

The evidence presented by the government showed that from approximately 2010 through 2012 a group of individuals—with one Curtis Donaldson at the center—agreed to work together to distribute cocaine to their overlapping customer bases.  To further this goal, the co-conspirators took on various and shifting roles in fulfilling the scheme's necessary tasks, including lending money to each other to purchase cocaine from suppliers, making purchases of cocaine, transporting the cocaine to a "headquarters" and cooking it there, monitoring for and communicating about law enforcement activity to avoid detection, selling cocaine and crack cocaine, and conducting accountings of relevant financial transactions.

4

Mr. Williams and Mr. Donaldson bought and transported drugs and paraphernalia together numerous times. Mr. Williams acted as a marketer for Mr. Donaldson's crack cocaine, and he once went alone, on behalf of Mr. Donaldson, to deliver an ingredient for another individual to use in cooking crack cocaine.

Mr. Bennett, still represented by Mr. Minix, was one of the government witnesses at Mr. Williams' trial.  Just before Mr. Bennett took the stand, Mr. Minix, the prosecutor, and the district court engaged in the following colloquy:

> MS. McEWEN:  Government calls Tyree Bennett, Your Honor.
> MR. MINIX:  Your Honor, may we approach real quick?
> THE COURT:  Yes.
> (Bench conference as follows.)
> MR. MINIX:  As the Court is aware, I'm representing Mr. Bennett on an appeal.  I was his second counsel, and he's been sentenced.  I think we had an agreement that there wasn't going to be any questions that would create a conflict.
> MS. McEWEN:  The government is not going to ask him any questions about Mr. Williams, Mr. Minix's client.
> MR. MINIX:  I just wanted to be sure the government wasn't going to ask him about anything I represented him on.
> MS. McEWEN:  We aren't.
> THE COURT:  I recall that's the understanding.
> (Bench conference ends.)
> THE COURT:  All right.  You may proceed.
> MS. McEWEN:  Thank you, Your Honor.

D.E. 323 at 158.[2]

---

[2] We have not been able to locate anything in the record that documents a prior discussion or agreement regarding the scope of Mr. Bennett's testimony.  Nor have we found any indication in

Mr. Bennett told the jury that he decided to cooperate with the government by testifying in Mr. Williams' trial in pursuit of the same goal that inspired him to appeal—a reduced sentence.  In his testimony on direct examination, Mr. Bennett did not mention Mr. Williams by name.  But he supported the government's case against both Mr. Williams and Mr. Toombs by directly describing (and by corroborating other witnesses' testimony concerning) the drug-distribution conspiracy alleged in the indictment.  For example, Mr. Bennett testified about the general way that a drug-distribution conspiracy operates, about the types and quantities of drugs distributed in connection with the charged conspiracy, and about the roles or duties of certain individuals in that conspiracy.  Mr. Bennett further explained that he obtained drugs from Mr. Donaldson, among others.  He also said that he had known Mr. Toombs since the two were about 12 years old; that he and Mr. Toombs dealt drugs that they obtained from Mr. Donaldson and others named in the Donaldson-led conspiracy until he was arrested in late 2011; and that Mr. Toombs and Mr. Donaldson continued selling drugs to his customers when he was incarcerated.

---

the record that Mr. Williams was aware of the possibility that Mr. Minix had a conflict due to his simultaneous representation of Mr. Bennett, let alone any indication that he knowingly and intelligently waived his right to conflict-free counsel. *See United States v. Alred*, 144 F.3d 1405, 1411 (11th Cir. 1998) (describing the waiver process).

On direct examination, Mr. Bennett made no mention of his letter to Mr. Toombs or how he had received an obstruction of justice enhancement at sentencing. When Mr. Toombs' counsel cross-examined Mr. Bennett, he did not ask about any of these topics either. Mr. Minix declined to cross-examine Mr. Bennett on behalf of Mr. Williams.

The government, in its re-direct examination, posed about a dozen questions to Mr. Bennett concerning the letter and the obstruction of justice enhancement. Mr. Bennett's testimony concluded with this exchange:

BY MR. HAMILTON:

Q: So you lost that three level reduction; is that correct?
A: Yes, sir.
Q: And that was as a result of a letter that you wrote?
A: Yes, sir.
Q: To Toombs? Does that perhaps leave you with any animosity toward Mr. Toombs?
A: No, sir.
Q: So you and him are straight even though you wrote that letter?
A: Yes, sir.

MR. HAMILTON: No further questions, Your Honor.
MS. McEWEN: Nothing further of this witness, Your Honor.
THE COURT: Any --
MR. MINIX: Nothing, Your Honor.
THE COURT: All right. Any reason this witness cannot be excused?
MS. McEWEN: None from the government, Your Honor.
THE COURT: Any objection?
MR. HAMILTON: No objection.
MR. MINIX: No objection.
THE COURT: All right.

7

D.E. 323 at 183–84.

Mr. Minix called one witness in Mr. Williams' defense case.  That witness testified that Mr. Williams drove her to work each day for several years.  Between her direct examination and cross-examination, the witness' testimony spanned just over five of the roughly 1,000 pages in the trial transcript.

## C

The jury found Mr. Williams guilty of the § 846 conspiracy charge.    The district court sentenced him to 20 years' imprisonment—the minimum term of imprisonment required pursuant to the information that the government filed pursuant to 21 U.S.C. § 851—followed by 10 years' supervised release.

In February of 2015, after Mr. Williams' trial but before sentencing, Mr. Minix submitted Mr. Bennett's initial brief to the Eleventh Circuit.  Several months later, we affirmed Mr. Bennett's sentence.  *See United States v. Bennett*, 614 F. App'x 403 (11th Cir. 2015).

## II

Mr. Williams contends that Mr. Minix had a conflict of interest due to his simultaneous representation of Mr. Bennett, and that this conflict had an adverse effect on his performance at trial.  This "conflict of interest claim is subject to *de novo* review." *Mills v. Singletary*, 161 F.3d 1273, 1287 (11th Cir. 1988).

8

## A

Under the Sixth Amendment, a defendant in a criminal case has the right to the effective assistance of trial counsel. *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Freund v. Butterworth*, 165 F.3d 839, 858 (11th Cir. 1999) (en banc). This right includes having counsel whose work is not affected by a conflict of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). A defendant claiming that his counsel rendered ineffective assistance due to a conflict of interest must, except in rare cases, establish an "actual conflict," i.e., a "conflict [that] adversely affected his counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 174 (2002). *See also id*. at 171 (an "actual conflict" is "a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties") (emphasis omitted).[3]

To demonstrate adverse effect, Mr. Williams must point to some "plausible alternative defense strategy or tactic that might have been pursued." *Freund*, 165 F.3d at 860 (alteration and internal quotation marks omitted). To be "plausible," the alternative strategy or tactic must have been "reasonable under the facts. . . . [But Mr. Williams] need not show that the defense would necessarily have been

---

[3] Under *Holloway v. Arkansas*, 435 U.S. 475 (1978), an "automatic reversal rule"—pursuant to which we conclusively presume that the conflict affected counsel's representation—applies "only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict." *Mickens*, 535 U.S. at 168.

9

successful [if the alternative strategy or tactic] had been used[;] rather he only need prove that the alternative possessed sufficient substance to be a viable alternative." *Id.* (citations and internal quotation marks omitted). Finally, Mr. McWilliams "must show some link between the . . . conflict and the decision to forgo the alternative strategy of defense. In other words, he must establish that the alternative defense was inherently in conflict with or not undertaken due to [Mr. Minix's] other loyalties or interests." *Id.* (citation and internal quotation marks omitted). *See also Porter v. Singletary*, 14 F.3d 554, 561 (11th Cir. 1994) (requiring that a defendant "point to specific instances in the record which suggest an impairment or compromise of his interests for the benefit of another party").

In contrast to most ineffective-assistance-of-counsel cases, the foregoing rule governing conflicts of interest is "prophylaxis," *Mickens*, 535 U.S. at 176, so that the defendant must establish "adverse effect," but "need not demonstrate prejudice in order to obtain relief." *Cuyler*, 446 U.S. at 349–50. Where there is a "breach[ of] the duty of loyalty, perhaps the most basic of counsel's duties," and "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests, . . . it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest"—although "the rule [still] is not quite the per se rule of prejudice that exists for [certain other] Sixth Amendment claims." *Strickland*, 466 U.S. at 692.

The question is whether "the verdict [is] unreliable, [irrespective of whether] *Strickland* prejudice c[ould] be shown." *Mickens*, 535 U.S. at 173.

**B**

As we have just said, an "actual conflict" is one that adversely affected counsel's performance. *See Mickens*, 535 U.S. at 171, 173–74. As we have done in some of our post-*Mickens* cases, *see, e.g., Ferrell v. Hall*, 640 F.3d 1199, 1244 (11th Cir. 2011), we think it is useful to first determine whether there was a conflict, and then to analyze whether that conflict ripened into an "actual conflict" because it had an adverse effect on counsel's performance.

On the issue of conflict, i.e., divided loyalties, the record before us—though not fully developed—shows several things. First, at the time of Mr. Williams' trial, Mr. Minix represented both Mr. Williams and Mr. Bennett (whose appeal on the obstruction of justice issue was pending before the Eleventh Circuit). Second, Mr. Bennett testified on behalf of the government in Mr. Williams' trial. So Mr. Minix simultaneously represented a defendant in a criminal trial and a witness for the prosecution at that trial. Third, Mr. Minix was faced with the choice of whether to cross-examine one of his clients (Mr. Bennett) while representing another (Mr. Williams). These undisputed facts allow us to begin to address Mr. Williams' conflict of interest claim. *See United States v. Camacho*, 40 F.3d 349, 355 (11th Cir. 1994) ("Generally, we do not consider claims of ineffective

11

assistance of counsel on direct appeal, because there usually has been insufficient opportunity to develop the record regarding the merits of these claims. We will, however, consider an ineffective assistance of counsel claim on direct appeal if the record is sufficiently developed.") (citation omitted).

"A conflict may arise from a lawyer's simultaneous or successive representation of adverse interests." *McConico v. State of Alabama*, 919 F.2d 1543, 1546 (11th Cir. 1990). As we explain below, Mr. Minix had a conflict of interest at Mr. Williams' trial.

The governing ethical canons of the legal profession, *see, e.g., Waters v. Kemp*, 845 F.2d 260, 263 (11th Cir. 1988), provide that, except under specified circumstances, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest," i.e., if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibility to another client[.]" Model Rules Prof'l Conduct R. 1.7(a)(2) (2014). We have noted that "[a]n attorney who cross-examines a former client inherently encounters divided loyalties." *Lightbourne v. Dugger*, 829 F.2d 1012, 1023 (11th Cir. 1981). Here the situation was more problematic because Mr. Bennett was Mr. Minix's current client.

At trial, Mr. Minix was "placed in the equivocal position of having to cross-examine his own client as an adverse witness. His zeal in defense of his client the

12

accused [Mr. Williams] [wa]s thus counterpoised against solicitude for his client the witness [Mr. Bennett]." *Castillo v. Estelle*, 504 F.2d 1243, 1245 (5th Cir. 1974) (Wisdom, J.) (concluding that defense counsel's "divided loyalties"—the simultaneous representation of a criminal defendant and of the victim/witness of the defendant's alleged crime in unrelated litigation—"amount[ed] to a denial of the right to effective representation essential to a fair trial"). In addition, Mr. Minix faced the possibility that Mr. Bennett "might take umbrage at a vigorous defense of [Mr. Williams] and dispense with [his future] services." *Zuck v. State of Alabama*, 588 F.2d 436, 439 (5th Cir. 1979). *See also Wheat v. United States*, 486 U.S. 153, 163–64 (1988) (upholding district court's decision to not allow a defendant to substitute his counsel with counsel for his co-defendants because of the ethical problems which would be faced by the latter in cross-examining his clients if they testified as government witnesses at the defendant's trial). Contrary to the government's argument, *see* Br. for the United States at 32–33, by the time of Mr. Bennett's testimony at Mr. Williams' trial, the conflict was no longer hypothetical.

In *McConico*, a simultaneous representation case similar in some ways to this one, we noted that "[t]he inherently antagonistic task of cross-examining a client was made more serious" because the cross-examination "called into question" the litigation position that the very same attorney was advancing for that

13

client. *McConico*, 919 F.2d at 1543, 1547–48.  James McConico was charged with the murder of his brother-in-law, Ricky Morton, and claimed self-defense.  James' wife, Brenda—who was Ricky's sister—retained  the same attorney who was representing James on the murder charge to recover insurance proceeds from Ricky's insurance policy.  That policy, however, contained an exclusion that denied payment if the death was related to Ricky's commission of an assault or felony—such as what would have prompted James to kill Ricky in self-defense.  Prior to trial, the insurance company paid Brenda and the attorney some of the proceeds from the policy.  After James' trial, Brenda and her other brother Rodney signed a document releasing the insurance company from any further liability arising out of the insurance claim.  *See id.* at 1544–45.

At James' trial, the attorney argued that James shot Ricky (who was allegedly the aggressor) in self-defense.  Brenda testified for the prosecution at trial, so the attorney who represented both her (on the insurance matter) and James (on the murder charge in the criminal case), and who was asserting contradictory theories on behalf of each client, had to cross-examine her.  The jury found James guilty, and the trial court sentenced him to life imprisonment.  *See id.* at 1545.

On these facts, we held that the opposing litigation positions of James and Brenda McConico presented "a situation of inherent conflict."  *Id*. at 1547.  We noted that the attorney "did not vigorously impeach" or otherwise attack Brenda's

14

testimony as much as he might have. *Id*. at 1549. Indeed, we said that the conflict "forced [him] to choose evidence less convincing for [James'] case . . . than was available." *Id*. at 1547.

As in *McConico*, here the undisputed facts establish a conflict of interest: Mr. Minix represented two clients concurrently, and when one of them testified at the other's trial, Mr. Minix had to decide whether to cross-examine.

## C

That leaves the question of adverse effect. Mr. Williams argues that the conflict faced by Mr. Minix adversely affected his performance, and his argument proceeds as follows: Mr. Minix failed to cross-examine Mr. Bennett; cross-examination was a viable option, given that, for example, Mr. Bennett left himself open to impeachment based on his post-detention criminal activity, which reflected a willingness to lie to the government; and it would have been impossible for Mr. Minix to cross-examine Mr. Bennett on this matter without both violating his duty of loyalty to Mr. Bennett and undermining his ongoing attempt to obtain a reduced sentence in the pending appellate proceedings (or, the reason that Mr. Minix did not cross-examine Mr. Bennett was *specifically* that he did not wish to violate his duty of loyalty to him, or that he did not wish to undermine Mr. Bennett's ongoing attempt to reduce his sentence). *See Freund*, 165 F.3d at 860.

As noted earlier, an adverse effect resulting from a conflict is not the same thing as prejudice in the run-of-the-mill *Strickland* sense. *See Mickens*, 535 U.S. at 173; *Cuyler*, 446 U.S. at 349–50; *Freund*, 165 F.3d at 860. We conclude that, on the existing record, Mr. Williams has made out a strong case of adverse effect. Mr. Minix chose not to cross-examine Mr. Bennett and, in the words of *Freund*, cross-examination appears to have "possessed sufficient substance to be a viable alternative" given the facts that led to Mr. Bennett's obstruction of justice enhancement. 165 F.3d at 860 (internal quotation marks omitted). In addition, cross-examination appears to have been "inherently in conflict with . . . [Mr. Minix's] other loyalties or interests" or appears to have "'not [been] undertaken due to th[os]e . . . other loyalties or interests.'" *Id.* Indeed, it appears that there was an agreement or understanding that Mr. Bennett would not testify about Mr. Williams, and this may have been an attempt to eliminate or at least minimize the conflict Mr. Minix faced due to his simultaneous representation. *See McConico*, 919 F.2d at 1547–49; *Castillo*, 504 F.2d at 1245. We note, as well, that "it is generally easier to prove actual conflict arising from simultaneous representation than from successive representation." *McConico*, 919 F.2d at 1546.

The government argues that there was no harm, and therefore no foul, because Mr. Bennett stayed away from directly incriminating Mr. Williams during his testimony. As a result, says the government, there was "nothing to be gained"

16

from cross-examination.  *See* Br. for the United States at 33.  This argument mistakenly applies the general *Strickland* prejudice standard to Mr. Williams' conflict of interest claim.  What matters is whether cross-examination "possessed sufficient substance to be a viable alternative."  *Freund*, 165 F.3d at 860.  The government's argument also overlooks the fact that Mr. Bennett's testimony helped establish the existence of the charged conspiracy (one of the key elements of the § 846 offense) and the role of various players in the scheme.  Impeaching Mr. Bennett with his obstructive conduct (which involved deception) would have at least served the purpose of undermining his credibility (and possibly a portion of the government's case).  The government's argument might be on more solid footing if Mr. Williams were required to show *Strickland* prejudice, but that is not a burden that he shoulders.  The same goes for the fact that the government, on re-direct examination, asked Mr. Bennett some questions about the obstruction of justice enhancement.  *See, e.g., Cuyler*, 446 U.S. at 349–50.

Nevertheless, we do not award Mr. Williams the relief he seeks—a new trial—at this time.  We think it is best to remand the case to the district court so that it can hold an evidentiary hearing and flesh out all of the relevant facts relating to Mr. Williams' conflict of interest claim.  *See, e.g., Burden v. Zant*, 871 F.2d 956, 957 (11th Cir. 1989) (remanding for an evidentiary hearing to determine the facts concerning a conflict of interest claim).  Among other things, we do not know if

Mr. Minix told Mr. Williams about his simultaneous representation of Mr. Bennett, or if Mr. Williams, having been so informed, was afforded a hearing under *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir. 1975), or given the opportunity to seek independent legal advice about the conflict. We do not know the specifics of the agreement or understanding amongst the parties and the district court to limit Mr. Bennett's testimony at trial. We do not know if there were any discussions between Mr. Minix and Mr. Bennett concerning the latter's testimony at Mr. Williams' trial. And we do not know what other reasons Mr. Minix might have had—aside from the divided loyalties resulting from his simultaneous representation—to forgo cross-examination of Mr. Bennett.[4]

### III

We remand for the limited purpose of having the district court conduct an evidentiary hearing on whether Mr. Minix's conflict resulted in an adverse effect. Once the district court has concluded the evidentiary hearing, it should prepare an

---

[4] We are cognizant of the possibility that, due to the existence of the attorney-client privilege between Mr. Minix and both of his clients, the district court may not be able to answer all of the questions we have set out in the text (or others it deems relevant). That possibility is one of the reasons why the actual conflict standard does not demand a showing of traditional *Strickland* prejudice. *See Mickens*, 535 U.S. at 168 ("[C]ounsel's conflicting obligations to multiple defendants 'effectively sea[l] his lips on crucial matters' and make it difficult to measure the precise harm arising from counsel's errors") (alterations in original, quoting *Holloway*, 435 U.S. at 489–90). It requires only some "link between the . . . conflict and the decision to forgo the alternative strategy of defense . . . [i.e., a showing] that the alternative defense was inherently in conflict with or not undertaken due to [Mr. Minix's] other loyalties or interests." *Freund*, 165 F.3d at 860.

order detailing its findings and conclusions and transmit that order, along with a supplemental record, to the clerk of this court.  The panel will retain jurisdiction over the appeal and permit the parties, at the appropriate time, to file supplemental briefs.[5]

**REMANDED WITH INSTRUCTIONS.**

---

[5] At this time we choose not to address the other issues Mr. Williams raises on appeal.