[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12130

_____

D.C. Docket No. 1:13-cr-00051-WLS-TQL-4

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

STEPHON WILLIAMS,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(February 20, 2020)

Before JORDAN and TJOFLAT, Circuit Judges, and HUCK,* District Judge.

PER CURIAM:

_____

* Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

A jury convicted Stephon Williams of a federal narcotics conspiracy in violation of 21 U.S.C. §§ 846 and 841. At the time of his trial, his attorney, Kim Minix, also represented Tyree Bennett, a government witness who was then appealing his own sentence on a related narcotics conspiracy charge. Mr. Minix did not cross-examine Mr. Bennett at Mr. Williams' trial. On appeal, and represented by new counsel, Mr. Williams contends that his conviction should be vacated because Mr. Minix labored under a conflict of interest that resulted in an "adverse effect."

When we first heard this appeal, we held that Mr. Minix labored under a conflict of interest due to his simultaneous representation of Mr. Bennett and Mr. Williams, but we remanded so that the district court could hold an evidentiary hearing on whether the conflict resulted in an "adverse effect." *See United States v. Williams*, 902 F.3d 1328, 1336 (11th Cir. 2018). Having carefully reviewed the record, the district court's order on remand, and the parties' post-remand briefs, we now affirm Mr. Williams' conviction. We also affirm Mr. Williams' sentence.

**I**[1]

From the early 1990s and continuing until 2012, Curtis Donaldson and his cousin, Kenneth Reese, along with several others, operated a drug distribution

---

[1] We set out the evidence at trial in detail, and then turn to the district court's findings following the evidentiary hearing.

organization out of Albany, Georgia. After Mr. Donaldson's arrest in January of 2010, law enforcement agencies began investigating the drug ring. Mr. Donaldson entered a plea deal in which he agreed to cooperate with the government. The investigation led to the arrest and conviction of Mr. Williams, Mr. Bennett, and several others.

## A

In September of 2013, pursuant to charges filed in a superseding information, Mr. Bennett pled guilty to conspiracy to possess cocaine and marijuana with the intent to distribute, in violation of 21 U.S.C. § 846. He agreed to cooperate with the government in exchange for the government's consideration of a Rule 35(b) motion to reduce his sentence.

Mr. Williams was indicted later and separately from Mr. Bennett. On November 12, 2013, he was charged—alongside Nathaniel Jackson, Donterius Toombs, Johnny Wesley, Eric Willingham, and Tony Wynn—with one count of conspiracy to possess with intent to distribute cocaine and crack cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(ii) and (iii). The indictment linked Mr. Williams and his co-defendants to the larger conspiracy that included Mr. Donaldson and Mr. Reese at the center and many others. The district court appointed Mr. Minix to represent Mr. Williams on November 20, 2013.

Mr. Minix's involvement in the Donaldson matter expanded in the early months of 2014. On March 24, 2014, the district court appointed him to represent Mr. Bennett for his sentencing, as Mr. Bennett's previous attorney, Oliver Register, had withdrawn due to a potential conflict of interest. Although Mr. Register did not state the source of the conflict, he represented Mr. Wesley in the Williams indictment.

About a month after Mr. Minix was appointed to represent Mr. Bennett, and about seven months after he began representing Mr. Williams, the district court held a pre-trial conference for Mr. Williams and his co-defendants. At that hearing, the government moved for a continuance in order to try all defendants named in the indictment together. On May 15, 2014, the court granted the motion, "agree[ing] that judicial economy would be best served if persons indicted were tried together." Mr. Williams would therefore be tried alongside Mr. Toombs and the others named in his indictment.

A month later, in June of 2014, Mr. Bennett—represented by Mr. Minix—had his sentencing hearing. There, the district court addressed a letter that Mr. Bennett had sent to Mr. Toombs from prison the previous year, asking Mr. Toombs to cooperate on his behalf in exchange for a substantial payment, and marketing a cooperation-for-hire scheme for other inmates seeking sentence reductions. Mr.

4

Minix did not dispute that Mr. Bennett wrote and sent the letter but argued that it did not constitute obstruction of justice under the Sentencing Guidelines.

In seeking for Mr. Bennett a two-point reduction for cooperation, Mr. Minix informed the district court that he previously "had talks with Ms. McEwen," and explained that "Mr. Bennett is going to offer information and hopefully corroborate some of this in Mr. Toombs' trial, which I think is set to try in October, Your Honor."[2]

The district court imposed an obstruction-of-justice enhancement under U.S.S.G. § 3C1.1, denied Mr. Bennett an acceptance-of-responsibility adjustment under U.S.S.G. § 3E1.1, and sentenced him to 156 months' imprisonment. Mr. Bennett appealed, still represented by Mr. Minix. His appeal was pending in the Eleventh Circuit at the time of Mr. Williams' trial in October of 2014.

On the morning of October 14, 2014, the first day of Mr. Williams' trial, the court held a hearing to address Mr. Wynn's change of plea and to discuss pending trial issues. Mr. Minix and Mr. Williams were present, as were Mr. Toombs and his counsel, Paul Hamilton. When asked if there were remaining issues, Ms. McEwen stated:

> There's one other issue I would like to address. We anticipate calling as one of our witnesses, Tyree Bennett, who is currently represented by Mr. Minix on appeal. To avoid any possible conflict of interest because

---

[2] Leah McEwen was counsel for the government in the three separate cases against Mr. Donaldson, Mr. Bennett, and Mr. Williams, and their respective co-defendants.

Mr. Minix is representing a client in this case, I have interviewed Mr. Bennett only as to Mr. Toombs, who is Mr. Hamilton's client[ ], and we do not expect he'll provide any information about Mr. Williams to the jury and I have discussed that with Mr. Minix.

Mr. Minix replied that, "[f]or the record, I have discussed the same with Mr. Williams about that, and that is true, everything else Ms. McEwen has said is true."

**B**

The joint trial of Mr. Williams and Mr. Toombs in October of 2014 lasted several days and involved more than a dozen witnesses.[3]

The evidence showed that from approximately 2010 through 2012, a group of individuals—with Mr. Donaldson and Mr. Reese at the center—agreed to distribute cocaine to overlapping customer bases. To further this goal, co-conspirators took on various roles, including lending money to each other to purchase cocaine, purchasing cocaine, transporting cocaine to a "headquarters" and cooking it there, monitoring for and communicating about law enforcement activity to avoid detection, selling cocaine and crack cocaine, and conducting accountings of relevant financial transactions.

In its case against Mr. Williams, the government sought to prove that he was Mr. Donaldson's "lieutenant" and right-hand man—that he delivered money and

---

[3] By this point, Mr. Wesley, Mr. Jackson, and Mr. Wynn had pled guilty, and Mr. Willingham had been declared incompetent to stand trial.

drugs for Mr. Donaldson, marketed his product on the streets, and sold the product, all in furtherance of the distribution scheme. Mr. Minix—in his opening statement and closing argument, and through cross-examination of witnesses—sought to demonstrate that Mr. Williams' mere presence around alleged conspirators did not amount to active participation in the conspiracy; that Mr. Williams occasionally ran small "errands" for Mr. Donaldson, including driving him around, without knowledge of the conspiracy; that he knew his co-defendant Mr. Toombs because they were cousins and lived together, and were only coincidentally driving together when they were pulled over; that to the extent Mr. Williams ever purchased drugs, it was in small amounts for personal use; and that the witnesses who testified for the government were convicted felons who "ha[d] motive to say anything the government wants them to."

**1**

Several witnesses implicated Mr. Williams directly. The first group comprised Donaldson conspirators, including Mr. Donaldson and Mr. Reese, as well as Willie Curry, Fred Shelton, and Demetrius Speed.

On direct examination, Mr. Donaldson testified that Mr. Williams drove him around to buy and sell drugs and to meet with other co-conspirators, that Mr. Williams saw him carrying drugs, and that he paid Mr. Williams in money and drugs for the rides. Ms. McEwen then sought to introduce several recorded conversations

7

between Mr. Donaldson and Mr. Williams as admissible co-conspirator hearsay statements. Mr. Minix argued at sidebar that the prosecution failed to lay the necessary foundation that Mr. Williams had participated as a co-conspirator or knew of the conspiracy. The district court concluded that there was enough evidence from Mr. Donaldson's testimony alone to infer that Mr. Williams knew of and participated in the conspiracy, and thus allowed the prosecution to introduce the conversations.

In one of the recorded conversations, Mr. Donaldson informed Mr. Williams that he had a new batch of high-quality crack cocaine, which he wanted Mr. Williams to market in the streets. Mr. Donaldson testified that Mr. Williams marketed drugs for him frequently, and that these marketing efforts made the distribution ring more profitable. In another conversation, Mr. Williams informed Mr. Donaldson that a third party wanted $100 of crack cocaine "on credit." In yet another recorded conversation, Mr. Williams told Mr. Donaldson that he was afraid of getting pulled over because he was "trafficking"—that is, driving with 28 grams or more of crack cocaine.

Mr. Minix cross-examined Mr. Donaldson to establish that, while Mr. Williams drove Mr. Donaldson for small payments, he lacked knowledge of the ongoing distribution conspiracy, and that when Mr. Williams purchased drugs from Mr. Donaldson, it was only in small, $20 quantities.

8

Other co-conspirators also implicated Mr. Williams.  Mr. Curry testified that Mr. Williams once delivered to him six ounces of "cut"—i.e., substances mixed into cocaine to increase the quantity—which Mr. Curry used in a batch of cocaine that was later distributed.  Mr. Shelton testified that he had met with Mr. Williams one or two times at the headquarters of the conspiracy and supplied him with drugs.

Mr. Minix cross-examined each of these witnesses, trying to establish that they did not know Mr. Williams at all, did not know him well, or did not see him actively participate in the conspiracy.  Mr. Minix also tried to elicit that, if the witnesses had seen Mr. Williams purchasing drugs, it was only in small quantities for personal use, and that Mr. Williams only ran small "errands" for Mr. Donaldson, sometimes driving him around or delivering non-illicit substances like creatine. Finally, Mr. Minix attempted to impeach the witnesses' credibility by demonstrating that they were convicted felons, motivated to testify to anything in exchange for sentence reductions.

Three police officers and DEA agents also testified and identified Mr. Williams.  Mr. Minix cross-examined each of these three witnesses—Officers Rod Williams, Evan Garlick, and Eugene Davis.  Officer Williams' testimony was the most substantial.  As a deputized task force officer for the DEA, he was offered as an expert on the drug trade.  He was also a lead agent investigating the Donaldson drug ring and assisted in, among other things, obtaining wiretaps of suspects and

9

orchestrating a traffic stop of Mr. Williams and Mr. Toombs to determine if they were transporting drugs or were in possession of phones identified through the wiretaps.

Mr. Minix conducted a voir dire of Officer Williams, and later cross-examined him about the process and propriety of his investigation. He also elicited that when Mr. Williams and Mr. Toombs were pulled over in the traffic stop, the officers did not find drugs in the car; that the investigation did not yield photographs of Mr. Williams at the headquarters of the Donaldson conspiracy; and that Mr. Williams at one point approached Officer Williams voluntarily and offered to help in the investigation by identifying some low-level drug dealers. Finally, Mr. Minix sought to establish that Officer Williams did not have tangible evidence that Mr. Williams drove Mr. Donaldson in furtherance of the conspiracy.

Officer Davis' and Officer Garlick's testimony was limited to the traffic stop mentioned above. Officer Williams had tipped Officer Davis that Mr. Williams and Mr. Toombs were driving without insurance. Officer Davis pulled them over on that pretext, though as noted above no drugs were found in the car. Officer Davis allowed them to leave the scene without the vehicle, which was then towed to an auto shop nearby. Mr. Minix cross-examined Officer Davis on how he obtained probable cause to stop Mr. Williams and Mr. Toombs.

Officer Garlick was on patrol the night of the stop and was called to the scene. He testified in his direct examination that when he arrived, he saw that Mr. Williams had a cell phone (apparently to establish that this was one of the cell phones identified in the Donaldson wiretap). Mr. Minix cross-examined him to establish that there were several distractions during the traffic stop and that he could not identify the make and model of the cell phone.

The government also called Romanda Brock, an employee at the auto parts shop where Mr. Williams' car was towed after he and Mr. Toombs were pulled over. She authenticated Mr. Williams' invoice and testified that he came into the shop and paid for the release of the vehicle. Mr. Minix did not cross-examine her.

**2**

The government called several witnesses who did not implicate Mr. Williams directly. Mr. Minix cross-examined some of them, but not others. The only Donaldson conspirator who testified and who did not implicate Mr. Williams by name was Mr. Bennett. As explained below, Mr. Minix did not question him.

As for the others who did not name Mr. Williams specifically, Mr. Minix did not cross-examine Officer Pearson, who testified only about Mr. Donaldson's operations and dealings with Mr. Speed. Officer Will Rodgers, Officer Eric Strom, and DEA Agent Jim Brown testified about the traffic stop of another conspirator, Hydarvis Hill. None mentioned Mr. Williams by name in direct testimony. Mr.

11

Minix cross-examined Officer Rodgers briefly, only confirming that Mr. Williams was not present at the traffic stop of Mr. Hill and that, during that stop, neither Mr. Donaldson nor Mr. Hill mentioned Mr. Williams. Mr. Minix did not cross-examine Officer Strom or Agent Brown.

Mr. Minix briefly cross-examined Elizabeth Adkins, a forensic chemist for the DEA and government expert witness.  She did not identify Mr. Williams, but testified about the DEA's chemical evidence testing, and explained that the evidence obtained from the Donaldson investigation contained cocaine and weighed about 45 grams.  Mr. Minix asked her one question about whether a certain cutting agent was a controlled substance.  He did not cross-examine Kai Allen, another DEA forensic chemist, who also testified about the weight and drug content of government exhibits and who also did not identify Mr. Williams.

Mr. Minix also questioned Henry Enright, a contractor for AT&T Mobility, who had testified about the government's wiretap records, in order to demonstrate that he only collected records and that he did not have knowledge of the content of the wiretaps.  Mr. Minix did not cross-examine Paula Yates, an associate of Mr. Toombs who testified about a dispute she had with Mr. Toombs over money.

**3**

As Mr. Minix had forecast at Mr. Bennett's sentencing hearing four months earlier, the government called Mr. Bennett to testify. Just before he took the stand, Mr. Minix, Ms. McEwen, and the district court engaged in the following colloquy:

MR. MINIX:      As the Court is aware, I'm representing Mr. Bennett on an appeal. I was his second counsel, and he's been sentenced. I think we had an agreement that there wasn't going to be any questions that would create a conflict.

MS. McEWEN:     The government is not going to ask him any questions about Mr. Williams, Mr. Minix's client.

MR. MINIX:      I just wanted to be sure the government wasn't going to ask him about anything I represented him on.

MS. McEWEN:     We aren't.

THE COURT:      I recall that's the understanding.

In his testimony on direct examination, Mr. Bennett did not mention Mr. Williams by name, but supported the government's case by offering details about the drug-distribution conspiracy, as well as his dealings with Mr. Toombs and Mr. Donaldson. For example, he testified about the way that a drug-distribution conspiracy operates, about the types and quantities of drugs distributed in connection with the charged conspiracy, and about the roles or duties of certain individuals in that conspiracy. Mr. Bennett explained that he obtained drugs from Mr. Donaldson, among others. He also said that he had known Mr. Toombs since the two were about twelve years old, that the two dealt drugs they obtained from Mr. Donaldson and

13

others until Mr. Bennett was arrested in 2011, and that Mr. Toombs and Mr. Donaldson continued selling drugs to his customers while he was incarcerated.

In its direct examination, the government did not question Mr. Bennett about his letter to Mr. Toombs or about his sentencing appeal, but did ask about his other criminal convictions, his plea agreement for participation in the Donaldson conspiracy, and his expectation of receiving a sentence reduction for substantial assistance. Mr. Bennett testified that he decided to cooperate and testify at the trial in search of a reduced sentence.

Mr. Hamilton, counsel for Mr. Toombs, then cross-examined Mr. Bennett about his prior criminal convictions, including an obstruction of justice charge. He asked whether that charge had anything to do with lying to the police or giving a false name, to which Mr. Bennett responded that it did not. Mr. Hamilton subsequently asked he had always been "honest and upright" with law enforcement, to which Mr. Bennett replied, "[y]es, sir."

Mr. Hamilton also questioned Mr. Bennett about his guilty plea and his potential sentence reduction for providing substantial assistance to the government. He also asked whether it was his understanding that, as a result of entering into a plea agreement, that he would get a sentence reduction for acceptance of responsibility. When Mr. Bennett confirmed that this was his understanding, Mr. Hamilton responded, "you received that reduction; did you not?" Mr. Bennett

14

answered "[n]o, sir."  Mr. Hamilton then asked "[a]re you sure?" to which Mr. Bennett answered again "[n]o, sir."  Mr. Hamilton did not follow up with questions about the cooperation-for-hire letter to Mr. Toombs.

Mr. Minix then declined to cross-examine Mr. Bennett.  On redirect, the government asked questions about Mr. Bennett's letter, the fact that he lost his acceptance-of-responsibility sentence reduction, and his sentencing appeal.  The government did not ask Mr. Bennett about receiving a two-level sentence enhancement for obstruction of justice.  Mr. Hamilton briefly re-questioned Mr. Bennett about whether he had any animosity toward Mr. Toombs after he lost the three-level acceptance-of-responsibility reduction based on the letter.

## C

The jury found Mr. Williams guilty of the conspiracy charge, and the district court later sentenced him to 20 years' imprisonment—the minimum term of imprisonment required pursuant to the information that the government filed pursuant to 21 U.S.C. § 851—followed by 10 years' supervised release.

In February of 2015, after Mr. Williams' trial, but before his sentencing, Mr. Minix submitted Mr. Bennett's brief to the Eleventh Circuit.  He argued that the letter to Mr. Toombs was not covered by U.S.S.G. § 3C1.1, and "should not have been construed as illegal conduct" by the district court.  Several months later, we

15

affirmed Mr. Bennett's sentence. *See United States v. Bennett*, 614 F. App'x 403, 406 (11th Cir. 2015).

## II

Represented by new counsel, Mr. Williams appealed his conviction and sentence. He argued that Mr. Minix labored under a conflict of interest that adversely affected his performance and that the district court erred by enhancing his sentence under 21 U.S.C. § 851.

We did not address Mr. Williams' sentencing challenge, but only his claim that he was denied effective assistance of counsel due to Mr. Minix's conflict of interest. We held that the undisputed facts—the simultaneous representation of the defendant and a witness for the prosecution—established that Mr. Minix labored under a conflict of interest. *See United States v. Williams*, 902 F.3d 1328, 1335 (11th Cir. 2018).

We then explained that on the existing record, Mr. Williams made a strong case for "adverse effect"—the second prong of the Sixth Amendment conflict-of-interest inquiry—because cross-examining Mr. Bennett "appears to have 'possessed sufficient substance to be a viable alternative'" strategy. *See Williams*, 902 F.3d at 1335 (quoting *Freund v. Butterworth*, 165 F.3d 839, 860 (11th Cir. 1999) (en banc)). We concluded, however, that the record was incomplete and there were several unanswered questions of fact regarding adverse effect. We remanded for the district

16

court to conduct an evidentiary hearing on that issue, while retaining jurisdiction over the appeal.

## A

At the evidentiary hearing, neither Mr. Bennett nor Ms. McEwen took the stand. The parties stipulated that "[i]f Assistant United States Attorney Leah McEwen were called to testify, her testimony would be consistent with, and would add no more to, the statement made to the Court on October 14, 2014, just prior to jury selection, during the trial of Stephon Williams and Donterius Toombs, and in the presence of all Parties, including Stephon Williams." Mr. Williams did not testify or introduce other evidence.

Only Mr. Minix testified. He first explained that he learned that Mr. Bennett would be a witness at Mr. Williams' trial from Ms. McEwen. Although he was not entirely sure when that happened, he believed it was only "a matter of days before the trial started" on October 14, 2014. Mr. Minix also confirmed that during Mr. Bennett's sentencing hearing on June 19, 2014, he had disclosed to the court a previous conversation with Ms. McEwen in which they discussed Mr. Bennett "offer[ing] some information to corroborate some of his . . . claims as in the Toombs' trial."

Mr. Minix testified that he had "looked over" Mr. Bennett's sentencing transcript prior to the evidentiary hearing but stated that he was "not sure [he] even

17

knew at that point [i.e., June 19, 2014, that] Mr. Toombs and Mr. Williams were going to be tried together." He acknowledged that "he may have known" Mr. Bennett was going to testify for the government at Mr. Williams' trial. But recalling that another co-defendant, Mr. Wynn, pled guilty just days before the trial, Mr. Minix stated that he in fact may not have known Mr. Toombs and Mr. Williams would be tried together.

Mr. Minix testified about announcing to the district court—in Mr. Williams' presence—that Mr. Bennett would testify at trial and that his understanding was that Ms. McEwen was not going to question him about Mr. Williams. Mr. Minix testified that he remembered explaining this to Mr. Williams—that he had "been assured by the government that there's not going to be any questions [posed to Mr. Bennett] related to [Mr. Williams]." He testified that he and Mr. Williams likely had this conversation "just days before the trial."

The government asked Mr. Minix whether he would have cross-examined Mr. Bennett if he had not been his client at the time. Mr. Minix testified that he would not have because, just like four other government witnesses that he did not cross-examine, Mr. Bennett did not implicate Mr. Williams. Mr. Minix also testified that he believed "the government did a pretty good job of demeaning [Mr. Bennett's] credibility on direct, and since there was nothing said about Mr. Williams, his involvement or his alleged involvement in the conspiracy, there wasn't anything to

18

question him on." Mr. Minix summed up by stating that had Mr. Bennett not been his client, his trial strategy still would have been the same.

Mr. Williams' new counsel cross-examined Mr. Minix at the evidentiary hearing. She asked whether he had declined to cross-examine Mr. Bennett "because the government had lived up to its bargain," to which Mr. Minix responded that "there was no need to cross examine him, he didn't implicate my client in any way . . . he didn't even identify him." Mr. Minix reiterated that whether the understanding with the government was really an "agreement," the government did not ask Mr. Bennett questions about Mr. Williams, and "there was no need to cross examine [Mr. Bennett]." Mr. Minix reiterated that the government had already done a "a pretty good job" of attacking Mr. Bennett's credibility on direct.

Mr. Minix also testified that "the goal of [his] discussions with the government" and the court was "to avoid any possible conflict of interest." He acknowledged that if the government had asked Mr. Bennett about Mr. Williams, "then [he] would have to have cross examined him," but was not sure whether that would have been a conflict of interest. Mr. Minix explained that, nonetheless, "the whole purpose of the discussion with Ms. McEwen and the two discussions with the Court was to avoid a conflict of interest" and that as soon as he found out about Mr. Bennett potentially testifying at trial, he did "everything that [he] thought [he] needed to do to avoid that conflict; number one, talking to Mr. Williams about it,

19

assuring from the government what kind of questions she was going to have, having two – two conversations on the record with the Court about that."

Mr. Minix further testified about a bar complaint that had been filed against him that had not yet been resolved. He explained that Mr. Williams did not initiate the complaint, but that it had been filed by the office of general counsel—likely after we issued our initial decision in *United States v. Williams*, 902 F.3d 1328 (11th Cir. 2018)—and that the complaint dealt with the Georgia bar rules governing conflicts of interest.

**B**

The district court determined that Mr. Minix was truthful and credible, and made the following factual findings.

The district court found that "Mr. Minix first learned Mr. Bennett would be a witness at [Mr.] Williams' trial 'just a matter of days before the trial started.'" As we explain below, this finding is incorrect because Mr. Minix knew that Mr. Bennett would be a witness months before the trial. The district court also found that Mr. Minix informed Mr. Williams of the simultaneous representation, and that the two understood that "the government interviewed Mr. Bennett only as to [Mr.] Williams'

co-conspirator, Mr. Toombs, and not as to [Mr.] Williams." As the parties stipulated, Mr. Williams was not afforded a *Garcia* hearing.[4]

The district court also found that Ms. McEwen represented to Mr. Minix that she had not questioned Mr. Bennett about Mr. Williams, and that she did not expect Mr. Bennett would provide information about Mr. Williams at trial. Ms. McEwen did not, however, state that the parties had any "agreement." Only Mr. Minix used the term "agreement," and it was not until right before Mr. Bennett's testimony; the district court therefore acknowledged that the parties had only an informal "understanding" which did not bind Mr. Minix or guide his trial strategy.

Regarding the trial strategy, the district court found that Mr. Minix had reasons, aside from divided loyalties, to forgo cross-examination of Mr. Bennett, and that he would have made the same decision even if Mr. Bennett had not been his client. The court found that Mr. Minix's strategy was not to cross-examine government witnesses who did not mention Mr. Williams. For that reason, he had not cross-examined four other government witnesses who did not testify to the culpability of Mr. Williams, except for Officer Rodgers, to whom Mr. Minix posed only one question. That question was whether he knew Mr. Williams, to which Officer Rodgers simply answered "no." However, as we discuss below, this finding

---

[4] A *Garcia* hearing is held to determine whether an actual or potential conflict of interest exists in the representation of a defendant, and, if so, whether the conflict can be knowingly and intelligently waived. *See United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975).

21

is also not technically correct because Mr. Minix cross-examined two other witnesses who did not testify about Mr. Williams.

Regarding Mr. Bennett, the district court found that his appeal concerned the purely legal issue of whether the court should have denied him credit for acceptance of responsibility in light of his "undisputed post-detention deceptive conduct" in sending the letter to Mr. Toombs. The district court found that Mr. Bennett's appeal strategy did not involve denying that he had sent the letter.

The district court also made factual inferences and conclusions of law, which we discuss further in our analysis.

## III

Under the Sixth Amendment, a criminal defendant has the right to the effective assistance of trial counsel. *See Strickland v. Washington*, 466 U.S. 668, 684–85 (1984). This right includes having counsel whose work is not hampered by a conflict of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). A defendant claiming ineffective assistance due to a conflict of interest must establish an "actual conflict"—that is, a "conflict [that] adversely affected his counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 174 (2002). *See also id*. at 171 (explaining that an "actual conflict" is "a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties").

To demonstrate adverse effect, a defendant must point to some "plausible alternative defense strategy or tactic that might have been pursued." *Freund*, 165 F.3d at 860 (alteration and internal quotation marks omitted). A plausible alternative strategy is "reasonable under the facts," but that does not mean the defendant must prove that strategy "would necessarily have been successful." *Id.* He only needs to demonstrate that the alternative strategy "possessed sufficient substance to be a viable alternative." *Id.*

Finally, a defendant must show "some link" between the conflict and the decision to forgo the plausible alternative strategy. *See id.* *See also Porter v. Singletary*, 14 F.3d 554, 560–61 (11th Cir. 1994) (requiring a defendant to "point to specific instances in the record which suggest an impairment or compromise of his interests for the benefit of another party"). Unlike the standard ineffective-assistance-of-counsel case, however, the defendant "need not demonstrate prejudice in order to obtain relief." *Sullivan*, 446 U.S. at 349–50.

"Because adequacy of counsel is a mixed question of law and fact, we conduct a plenary review of the district court's conclusions." *Porter*, 14 F.3d at 558. The district court's underlying factual findings can be reversed only if they are clearly erroneous, while conclusions about the constitutional effect of counsel's conflict are reviewed *de novo*. *See McConico v. State of Ala.*, 919 F.2d 1543, 1545 (11th Cir. 1990). A factual finding that has no support in the record is clearly erroneous. *See*

23

*Day v. Persels & Assocs., LLC*, 729 F.3d 1309, 1327 (11th Cir. 2013); *Jones v. Beto*, 459 F.2d 979, 980 (5th Cir. 1972).

Whether an attorney had some tactical reason to forgo an alternative strategy is a question of historical fact, but it is a mixed question whether the alternative strategy was "plausible" or "reasonable." *See Jefferson v. GDCP Warden*, 941 F.3d 452, 474 (11th Cir. 2019) (explaining that under *Strickland* we "review the reasonableness of a strategic decision *de novo*, while the antecedent inquiry of whether the action was in fact a strategic one, rather than the result of neglect, is a question of fact, and the district court's determination in that respect is presumed to be correct unless it's clearly erroneous") (internal quotations marks and citations omitted).

Likewise, the question of whether there was "some link" between a conflict and an attorney's decision to forgo a strategy involves both historical facts and mixed questions. There may be material facts about what the attorney did, when, and why. Those facts are reviewed for clear error. *See id.* But whether an attorney's reasons and actions establish the "link" between his conflict and his decision to forgo a tactic cross-examination (in other words, whether the "link" was sufficient to demonstrate an "adverse effect") is a mixed question, subject to *de novo* review. *Cf. Freund*, 165 F.3d at 859 ("[O]nce the petitioner paints the factual picture of the two

24

representations and what the lawyer did in each, a relatively dry and common sense evaluation ensues to determine whether they are sufficiently linked.").

## IV

### A

The district court concluded that there was no conflict of interest due to Mr. Minix's simultaneous representation of Mr. Bennett and Mr. Williams. Because Mr. Bennett was not challenging the fact of his "undisputed post-detention deceptive conduct" in his appeal, the district court reasoned that there was "[n]o actual opposing litigation position between the subject of Mr. Bennett's appeal and [Mr.] Williams' charged conduct." That inference led to the conclusion that Mr. Minix did not labor under a conflict of interest.

In our initial opinion, however, we held that Mr. Minix labored under a conflict of interest. *See Williams*, 902 F.3d at 1335 ("Here the undisputed facts establish a conflict of interest: Mr. Minix represented two clients concurrently, and when one of them testified at the other's trial, Mr. Minix had to decide whether to cross-examine."). To the extent the district court concluded otherwise, it was mistaken. *See Westbrook v. Zant*, 743 F.2d 764, 768 (11th Cir. 1984) ("[F]indings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal.").

25

In any event, nothing in the expanded record convinces us that our prior conclusion was wrong.  Even if cross-examination would not have directly undermined Mr. Bennett's appeal strategy, cross-examining one's client can still be "inherently antagonistic." *McConico*, 919 F.2d at 1543, 1547–48. *See also Porter*, 14 F.3d at 561 ("An attorney who cross-examines a former client inherently encounters divided loyalties").  Here, cross-examination would have involved attacking Mr. Bennett's character and impugning his honesty.  An attorney may be hesitant to do that to a client, even if doing so would not necessarily elicit self-incriminating information harmful to the client's criminal defense or sentencing/appellate strategy.

## B

In evaluating the second prong—whether the conflict of interest had an adverse effect on Mr. Minix—we suggested in our prior opinion that cross-examination "appears to have possessed sufficient substance to be a viable alternative given the facts that led to Mr. Bennett's obstruction of justice enhancement." *Williams*, 902 F.3d at 1335 (internal quotation marks omitted).  We refrained, however, from making any definitive conclusion.

After the evidentiary hearing, the district court concluded that cross-examination of Mr. Bennett was not a reasonable alternative strategy.  This legal conclusion was based on two factual inferences.  First, Mr. Bennett's testimony

26

alone would not make out a *prima facie* case against Mr. Williams and the government had other witnesses establishing his participation in the conspiracy. Second, cross-examination could have "backfire[d]," as it would have given Mr. Bennett the opportunity to implicate Mr. Williams. In other words, according to the district court, the risks of cross-examination substantially outweighed the benefits. The district court concluded therefore that conflict-free counsel likely would not have accepted this "avoidable risk" and "cross-examination of Mr. Bennett was not a reasonable alternative under the facts and in those circumstance."

In our view, cross-examination was a viable alternative strategy. When Mr. Minix had the opportunity to cross-examine Mr. Bennett, neither the government nor Mr. Hamilton had questioned Mr. Bennett specifically about his post-detention letter to Mr. Toombs, which resulted in an obstruction of justice enhancement. Even though Ms. McEwen eventually brought up the letter in her redirect examination, there is no evidence that Mr. Minix knew she would. The record shows that the prior "understanding" between Ms. McEwen and Mr. Minix was that she would not question Mr. Bennett about Mr. Williams, not that she would raise the letter or impeach Mr. Bennett's credibility at trial in the event Mr. Minix or Mr. Hamilton declined cross-examination on the issue. *See Proffitt v. Wainwright*, 685 F.2d 1227, 1247 (11th Cir. 1982) ("[T]he assistance rendered must be evaluated from the perspective of counsel, taking into account all of the circumstances of the case, but

27

only as those circumstances were known to him at the time in question.") (internal quotation marks omitted).[5]

The district court underestimated the benefit of cross-examination. At that moment, Mr. Minix had an opportunity to introduce new and highly probative evidence that Mr. Bennett—a witness testifying for the government—was not credible. It is true that the government and Mr. Hamilton had already broached the subjects of Mr. Bennett's prior criminal history, current plea deal, and expectation of receiving sentencing reduction. But Mr. Bennett's attempt to enlist co-conspirators to participate in a cooperation-for-hire scheme was perhaps even more powerful evidence that his testimony, generally, should not have been trusted. Moreover, Mr. Bennett had testified that he had always been honest and forthright with law enforcement, but neither the government nor Mr. Hamilton pointed out that he had received an obstruction-of-justice sentence enhancement for sending the letter.

It is also true that Mr. Bennett did not identify or implicate Mr. Williams directly and, as the district court concluded, that the government would not have been able to prove Mr. Williams' guilt solely based on Mr. Bennett's testimony. But

---

[5] During its direct examination of Mr. Donaldson, and before Mr. Bennett took the stand, the government presented to the jury a recorded conversation in which Mr. Donaldson informed Mr. Toombs that he had received a letter from Mr. Bennett from prison. Mr. Donaldson was not asked and did not testify, however, that Mr. Bennett was trying to enlist him in the cooperation-for-hire scheme.

that does not mean Mr. Bennett's testimony was not helpful to the government's case against Mr. Williams.  Mr. Bennett corroborated details about the charged conspiracy and implicated Mr. Williams' co-defendant, which could have had potential spill-over effect as to Mr. Williams.  *See Zafiro v. United States*, 506 U.S. 534, 539 (1993) (explaining that "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty").  Any evidence that cast doubt on Mr. Bennett's credibility would therefore have been helpful to Mr. Williams, at least to some extent, even if it would not have changed the outcome of the trial.  To satisfy this prong of *Sullivan*, a defendant does not need to prove that an alternative strategy would have carried the day, but only that it was viable and reasonable—that it was "realistically available."  *United States v. Mers*, 701 F.2d 1321, 1331 (11th Cir. 1983).

In some cases, an ostensibly reasonable strategy may come with such great risk as to make it unreasonable under the circumstances.  *See Foster v. Schomig*, 223 F.3d 626, 631 (7th Cir. 2000) (a decision not to call a witness is sound "if it is based on the attorney's determination that the testimony the witnesses would give might on balance harm rather than help the defendant"); *United States v. Sheneman*, No. 3:10-CR-126 JD, 2015 WL 4139247, at *20 (N.D. Ind. July 8, 2015) ("It was well within the range of reasonable trial strategy to decline to call such a risky and, likely, harmful witness.").  But we disagree with the district court's factual inference here

29

that cross-examination of Mr. Bennett could have "backfired" and therefore was prohibitively risky. This factual inference has no support in the record and is therefore clearly erroneous. *See Day*, 729 F.3d at 1327; *Jones*, 459 F.2d at 980.

For one, there is no evidence that cross-examination would have given Mr. Bennett the opportunity to implicate Mr. Williams, particularly if Mr. Minix limited his questions to the letter. Mr. Bennett would have been constrained to answer Mr. Minix's questions during cross-examination and would not have been free to discuss Mr. Williams. The strategy could have backfired if Mr. Williams had received a copy of the letter, such that Mr. Bennett might mention this fact when asked about the letter on cross-examination. But there is no evidence whatsoever that Mr. Williams received the letter.

The strategy may also have backfired if for some reason it provoked Ms. McEwen to question Mr. Bennett about Mr. Williams on redirect examination. But Ms. McEwen did not testify, so there is no evidence about what she would have done had Mr. Minix decided to cross-examine Mr. Bennett about the letter. Moreover, it appears doubtful that the district court would have permitted redirect examination of Mr. Bennett on the new topic of Mr. Williams' involvement in the conspiracy. *See United States v. Riggi*, 951 F.2d 1368, 1375 (3d Cir. 1991) (explaining that while the scope of redirect examination is committed to the sound discretion of the district court, "[t]he tradition in the federal courts has been to limit the scope of redirect

examination to the subject matter brought out on cross-examination," and "[i]deally, no new material should be presented on redirect, because litigants will in theory have presented all pertinent issues during the direct examination."); *United States v. Terry*, 187 F.3d 650 (9th Cir. 1999) ("As a general rule, the scope of redirect examination is limited to the scope of cross-examination.") (internal quotation marks omitted). Moreover, if Mr. Minix's cross-examination were going to motivate Ms. McEwen to bring up Mr. Williams on redirect, that would suggest their "understanding" was broader than represented—that Mr. Minix explicitly agreed not to cross-examine Mr. Bennett and that Ms. McEwen would penalize him for not holding up his end of the bargain. This would contradict the district court's factual finding that the understanding was only that the government would not question Mr. Bennett about Mr. Williams.

Finally, and most importantly, Mr. Minix himself did not testify about any potential dangers to cross-examining Mr. Bennett. He testified only that, during trial, he believed "there wasn't anything to question [Mr. Bennett] on" in light of the government's direct examination and "there was no need to cross examine him" because he did not implicate Mr. Williams.

The district court's conclusion about the risk of cross-examination also depends on the implicit factual inference that Mr. Bennett had inculpatory information about Mr. Williams. If Mr. Bennett had never seen Mr. Williams before

31

or had never witnessed him actively participating in the conspiracy, however, cross-examination could never have "backfired," even if it for some reason prompted Ms. McEwen to ask questions about Mr. Williams on redirect.  There is no information in the record regarding what Mr. Bennett knew or would have said about Mr. Williams.  As noted earlier, Mr. Bennett did not testify at the evidentiary hearing, and Mr. Minix was not asked any questions about his discussion (or lack thereof) with Mr. Bennett as to Mr. Williams.[6]

The district court's legal conclusion about the reasonableness of cross-examination therefore depends on unsupported factual inferences about the risks and rewards of the strategy.  Removing those inferences from the equation, the legal conclusion does not add up.  Mr. Minix had a chance to introduce evidence harmful to the credibility of an adverse witness, and to do so without any apparent risk to Mr.

---

[6] One of the co-conspirators, Mr. Shelton, testified at trial that on one occasion Mr. Williams drove Mr. Donaldson to meet with him at Mr. Bennett's house.  There is no direct testimony, however, that Mr. Williams knew he was driving to Mr. Bennett's house on that trip, that he went into the house with Mr. Donaldson, or that he ever met Mr. Bennett.  Indeed, Mr. Donaldson testified that Mr. Williams generally would "drop [him] off" at the destinations, and then "leave and come back" when Mr. Donaldson was ready to go.  Mr. Donaldson also offered specific examples of times when Mr. Williams waited in the car while he transacted business.

Assuming that Mr. Bennett and Mr. Williams knew each other—perhaps through Mr. Toombs—we still have not found direct evidence that Mr. Bennett witnessed Mr. Williams participating in the conspiracy. Notably, the government introduced several intercepted phone conversations between Mr. Donaldson and Mr. Williams, and others, but it did not introduce any calls on which Mr. Bennett participated, as he had already been incarcerated by the time the wiretap was authorized.

Williams.  The strategy was therefore reasonable and realistically available under the circumstances.

## C

The district court concluded that Mr. Williams failed to establish the requisite "link" between Mr. Minix's decision to forgo cross-examination and his conflict of interest.  It rejected the notion that Mr. Minix made his decision based on any "agreement" with the government and concluded that Mr. Minix's trial strategy motivated his decision.  The standard of review on appeal and the limitations of the record compel us to the affirm the district court's conclusion on this prong of the analysis.

## 1

Although the district court committed two errors in its analysis, its ultimate credibility determination and its findings regarding Mr. Minix's trial strategy were not clearly erroneous.  We address each error in turn.

First, the district court found on remand that Mr. Minix learned that Mr. Bennett would be a witness at Mr. Williams' trial "just a matter of days before the trial started," i.e., in October of 2014.  This factual finding was clearly erroneous. *See United States v. Clarke*, 562 F.3d 1158, 1165 (11th Cir. 2009) (explaining that there is clear error when "we are left with a definite and firm conviction that a

33

mistake has been committed").[7]   Mr. Minix knew that Mr. Bennett would likely testify against Mr. Toombs at least by June 9, 2014, when he disclosed as much to the district court during Mr. Bennett's sentencing hearing, but perhaps as early as March of 2014, when he first took over Mr. Bennett's case.  He also knew that Mr. Williams and Mr. Toombs were going to be tried together by May of 2014, when the court granted the government's motion to try the defendants in the indictment together.  Taking these two undisputed facts collectively, Mr. Minix knew about the potential conflict at least by June of 2014, four months before the trial.[8]

Second, Mr. Minix cross-examined three other witnesses (other than Mr. Bennett) who did not name his client, and not just one, as the district court found. As the court recognized, Mr. Minix briefly cross-examined Officer Rodgers, who did not directly implicate Mr. Williams.  But he also cross-examined Ms. Adkins, the DEA forensic chemist who testified about chemical evidence testing and samples from the Donaldson investigation, and Mr. Enright, the AT&T contractor who testified about wiretap records, even though neither named Mr. Williams in their direct examination.   Nevertheless, these witnesses did not have any specific

---

[7] Although Mr. Williams does not raise this error on appeal or otherwise argue for reversal based on when Mr. Minix learned of the potential conflict, we address the error here on our own.

[8] We are not convinced by Mr. Minix's explanation during the evidentiary hearing that he may not have known Mr. Toombs and Mr. Williams would be tried together based on Mr. Wynn pleading guilty days before the trial.  It is not clear what Mr. Wynn's plea had to do with Mr. Toombs and Mr. Williams being tried together, which had been decided in May of 2014, and Mr. Minix was not pressed further on his explanation.

incriminating information about Mr. Williams, so Mr. Minix did not run a risk of harming his client by questioning them.

We are not convinced that either of these errors is grounds for reversing the district court.  We accept that Mr. Minix in fact had a general trial strategy not to cross-examine witnesses who did not implicate Mr. Williams and that he would not have cross-examined Mr. Bennett even if he had not been his client.  The district court was aware of Mr. Minix's ongoing disciplinary proceedings, *see United States v. Malpiedi*, 62 F.3d 465, 470 (2d Cir. 1995) (observing that "after-the-fact testimony by [a conflicted] lawyer … is not helpful," as "[e]ven the most candid persons may be able to convince themselves that they actually would not have used that strategy or tactic anyway"), but nevertheless found him credible, and that credibility choice is not clearly erroneous.  Without more information we defer to the district court's credibility determination and its findings regarding Mr. Minix's strategy.  *See McGriff v. Dep't of Corr.*, 338 F.3d 1231, 1238 (11th Cir. 2003) ("Absent evidence of clear error, we consider ourselves bound by a district court's findings of fact and credibility determinations.").

**2**

In our view, more important than the two errors in the district court's analysis is the fact that there is no direct evidence in the record establishing the necessary "link" to complete the showing of "adverse effect."  For example, we do not have

35

Mr. Minix's notes, files, or any other work product that could have shed more light on his trial strategy. We also do not have any testimony from Ms. McEwen, Mr. Minix, or Mr. Bennett about what Mr. Bennett knew about Mr. Williams.

Mr. Williams focuses on two pieces of evidence that he argues establish an "agreement" that tied Mr. Minix's hands. He points first to the hearing at which the parties informed the district court of the potential conflict and, second, to Mr. Minix's testimony at the evidentiary hearing. But other than Mr. Minix's casual use of the word "agreement" prior to trial, there is no other evidence of a real agreement. Nor is there evidence that he based his trial strategy on such an agreement. Mr. Minix testified he was not motivated by an agreement, but only by the fact that Mr. Bennett did not implicate Mr. Williams: "I mean, the simple fact is, whether it was an agreement or not, they didn't – the government didn't ask any him any questions about my client and therefore there was no need to cross examine him." The district court credited this testimony, and its credibility finding is not clearly erroneous. *See McGriff*, 338 F.3d at 1238; *Porter*, 14 F.3d at 561 (finding that the district court did not clearly err where (1) an attorney testified that he did not refrain from cross-examining a witness, who was a former client, because of the prior representation and (2) there was no affirmative evidence to contradict that testimony).

Without evidence directly contradicting Mr. Minix's testimony, which the district court found credible, we cannot say that Mr. Williams established an adverse effect, and his conflict-of-interest claim must fail.

## V

We now turn to Mr. Williams' arguments regarding his sentence enhancement under 21 U.S.C. § 851.

## A

Mr. Williams first argues that the district court erred in concluding that the government complied with the service requirements under 21 U.S.C. § 851(a)(1) for a mandatory minimum sentence enhancement under 21 U.S.C. § 841(b)(1)(A). We disagree.

Under § 841(b)(1)(A), any person convicted of possession with intent to distribute more than 5 kilograms of cocaine "shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life." If the defendant "commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment." *Id.*

In order for the court to impose an enhanced sentence based on prior convictions, the government must comply with § 851(a)(1), which requires it to "file[ ] an information with the court (and serve[ ] a copy of such information on the

37

person or counsel for the person) stating in writing the previous convictions to be relied upon." We demand "strict compliance with the mandatory language of the procedural requirements of [§] 851(a)." *United States v. James*, 642 F.3d 1333, 1339 (11th Cir. 2011) (quoting *United States v. Weaver*, 905 F.2d 1466, 1481 (11th Cir. 1990)).

Mr. Williams claims that the government failed to "serve" a copy of the notice of enhancement on him or his counsel, as it filed the notice on the district court's electronic filing system. Although Mr. Williams concedes he was timely informed of the potential enhancement one month before trial, he claims that the service was not adequate under the statute because it was filed electronically.

We review *de novo* the adequacy of notice under § 851. *See United States v. Ladson*, 643 F.3d 1335, 1341 (11th Cir. 2011). We note, however, that Mr. Williams' co-defendant, Mr. Toombs, raised the same argument in his appeal, and we rejected it in *United States v. Toombs*, 748 F. App'x 921, 928 (11th Cir. 2018). We find that decision persuasive and affirm Mr. Williams' sentence for the same reasons.

Like Mr. Toombs, Mr. Williams concedes that § 851 service via the court's electronic filing system is permissible if the local rules permit it, but he argues that the relevant local rules of the Middle District of Georgia do not include the district court's electronic filing procedures. We disagree. Under the local rules of the

Middle District of Georgia, filing a document electronically for a given case "constitutes service on all users registered as participants in that case." *Id.*

Here Mr. Minix was admitted to practice before the district court, entered a notice of appearance electronically in the case on November 20, 2013—becoming a registered user in the case who consented to service via CM/ECF filing, *see* D.E. 282-1 at 1—and remained Mr. Williams' attorney well past September 19, 2014, the date that the government filed the notice in question. Accordingly, the government satisfied § 851's service requirement.

**B**

Mr. Williams raises another argument that we rejected in *Toombs*—that district court erred by enhancing his sentence under § 851 because the prior conviction was too old to be fairly considered and the enhancement was imposed as a penalty for exercising his Sixth Amendment right to a trial. More specifically, Mr. Williams argues his prior conviction for marijuana distribution was thirty years old, that marijuana is now legal in many states, and that the Attorney General at time, Eric Holder, had issued a memorandum that prosecutors should decline to file § 851 enhancements unless "the case is appropriate for severe sanctions."

As we said in *Toombs*, Mr. Williams "cannot rely on the internal Department of Justice policy memorandum to which he refers because, rather than establishing binding norms, the memorandum leaves prosecutors 'free to consider the individual

39

facts in the various cases that arise.'" *Toombs*, 748 Fed. App'x at 929 (quoting *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir. 1983)). *See also United States v. Wasserman*, 504 F.2d 1012, 1016 (5th Cir. 1974) (finding "no basis for prohibiting prosecutions which violate internal Department of Justice policy memoranda" and rejecting the contention that the government prosecuted the defendants "in contravention of a Department of Justice policy memorandum"); *United States v. Strong*, 844 F.3d 133, 136 (2d Cir. 2016) (rejecting precisely Mr. Williams' argument as to the same DOJ memo).

Mr. Williams' argument that the enhancement was an unconstitutional punishment for his exercise of his Sixth Amendment rights also fails. Notwithstanding its recognition that "punish[ing] a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort," *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978), the Supreme Court has held that the government may freely encourage criminal defendants to plead guilty "in the 'give-and-take' of plea bargaining" by offering "a lenient sentence or a reduction of charges" for pleading guilty or by dangling increased penalties or additional charges for failing to plead guilty. *See id.* To hold to the contrary, *Bordenkircher* observed, "would contradict the very premises that underlie the concept of plea bargaining itself." *Id.* at 365. Thus we rejected this Sixth Amendment argument in *Toombs*, *see* 748 Fed. App'x at 929–30, and other courts of appeals have uniformly rejected

40

the same type of challenges. *See United States v. Kent*, 649 F.3d 906, 913 (9th Cir. 2011); *United States v. Jenkins*, 537 F.3d 1, 5 (1st Cir. 2008); *United States v. Morsley*, 64 F.3d 907, 920 (4th Cir. 1995); *United States v. Mosley*, 14 F.3d 54 (5th Cir. 1994).  We do so again here.

## VI

For the foregoing reasons, we affirm Mr. Williams' conviction and sentence.

**AFFIRMED.**